Good morning, Your Honors. May it please the Court, Gwendolyn Giblin on behalf of the Plaintiff and Appellant in this case. I'll keep track of my time, but I intend to reserve about three minutes. The court issue in this case is whether the investors in Textainer got all the information they were entitled to receive and that Textainer was required to provide to these investors in voting on this asset sale. And through the course of the complaints in this case, the district court required an extremely demanding amount of detail. And as a result, this complaint is an extremely detailed complaint. And I really ask the court to look at it carefully because there is no boilerplate in here. It has very detailed allegations based on plaintiff's consultation with an expert in the field of valuation of containers, supporting everything that is said in here. Now, the district court did not agree with that and found that certain allegations in the complaint were conclusory. But the real issue is we need to make sure that these investors receive the information that they were entitled to receive. And they didn't. One issue that the district court raised was whether the container prices of new shipping containers correlated to an increase in value of containers that were already out in the market. Are you saying the amortization on a used container would produce a market value equivalent to a new container? It may very well do that. The way that the valuation of containers is determined I'm going to buy new containers because they're better, they're not used, they're not wearing out, they're not rusting, they're painted, they're bright, they're clean. Right? Correct. But the factors such as the bright and clean really doesn't matter in terms of the function of the container. The way the containers are valued is based on a discounted cash flow basis. So what the valuation consists of is looking at the leasing values and then the remaining value of that container. I think that that kind of an appraisal opinion defies the market. Well, if you look at the complaint I'd like to direct if the containers were worth as much and they're a better value, the manufacturer would be charging more than a used container. Well, the issue here, going back to the proxy allegations, is whether the investors should have been told that there was this enormous increase in valuation of the new containers and that that also would have increased the value of the containers that were within their fleets. Well, they were told that there had been an increase in the market. But not such an extreme increase of 18 to 20%. You wanted the word dramatic put in there in front of increase, right? You know, I won't agree with that. I don't think the word dramatic, because that doesn't give factual information they need. What I would have liked to see in there were facts that would give the investors the information they need. The word dramatic would, in my view, summarize that. But how about specific facts explaining why the containers had gone up in value? Telling the investors and making it clear. And what principle of law requires that? The basic proxy statement law is that the investors are entitled to receive all the information that a reasonable investor would find material to making a decision to vote on the asset sale. Something like container values going up significantly, 18 to 20%. That's material. If there was something valued in the financial markets today back in January and it were being sold today and there were such dramatic changes, that's something investors would want to know and they need to know to make an investment. Now, there's the same type of change in the container industry during this period. The containers were going up in value as opposed to the markets right now, financial markets. But it's the same idea that provided with information that's ten months old and we're not claiming, this is not a fraud case, it's a negligence case. We're not claiming Textainer misrepresented, lied, anything like that. It's that Textainer provided information about the container values as of March 2004 and was clear about that, but did not provide investors with the information they needed to understand that this ten-month period was very significant and that very significant things had happened in the market in the interim. Much of our complaint is we quote throughout the analytics an expert in the container industry. This is a company and a specific consultant that Textainer itself has relied upon and retained over the years. The analytics confirms the allegations in the complaint that there is a correlation between an increase in the new container prices and the existing container prices. World Cargo News, we quote in the complaint, in the record at page 833, it says exactly that. The rise in new container prices has brought about another benefit for the lessors in that the value of existing equipment assets has been upwardly revised. So that was publicly available to anybody who was interested. No, and the district, it actually wasn't. The district court ruled in one of the earlier motions to dismiss that this kind of information was not available to your general investors. There is no reliance requirement for this claim, but it was determined that this type of information was generally available only in trade magazines, and the only people that would have those trade magazines would be people specifically in the container industry. So it's not an issue of why didn't the investors just go out and read this information on their own or get this information on their own. It was not publicly or readily available to them. Sotomayor, if you're going to invest in a particular area and you've been given information concerning the situation in that area, should you say I don't need to invest, look any further, I can depend entirely on what I've been given, or? Well, no, that's a very good question. And in the situation here, the proxy statement which was being given to them goes at length as to why Textaner believes that this transaction was fair and in the best interest of the limited partners. Textaner goes through all that analysis, and there is nothing to believe that Textaner was trying to pull the wool over the eyes of the investors, and we're not claiming that. What we're claiming is that Textaner was negligent in not including all of the information to provide the context for these investors to properly assess the value of the containers upon their sale. And so that proxy statement ---- Did Textaner have any interest in having this sold at less than the best price they could get? We have alleged that there were reasons where that might be possible, and again, we're not alleging that there was fraud involved in this. There is a breach of fiduciary duty aspect to this case as well where that would probably be more pertinent. What interest would Textaner have had in selling these partnerships at less than the best price they could get? As just one example, the military contract issue. Textaner entered into a very large contract with the U.S. Army, about $180 million-plus value of it, and it required that Textaner be able to provide containers on little or no notice to the Army on very strict terms. And so Textaner had to maintain easy access to containers to fulfill those obligations. I don't see how that answers Judge Bivey's question. Textaner needed to have access to the containers, and I guess to be more specific, it needed to have, with the partnerships, there are certain things that Textaner would have to go through to do a transaction like this. The containers were sold to RFH, which consists of entities that Textaner had existing relationships with. But why would that induce Textaner to want to sell the containers for less than their best value? I don't think that Textaner and most of them. That was the question. Yeah. What does the military contract have to do with Textaner having an interest in selling this for less than the best value it could get? Textaner would have done that for its own convenience and not so much to get less value for the limited partners, but more because it would maintain a friendly buyer that it could easily have access to these containers. It would only have to deal with one entity, with RFH, that had existing relationships with the underlying entities at RFH. It needed to find a sympathetic buyer so that it could get these containers at short notice in order to provide them to the military? It would make it much easier to do that. And then there are also some minor issues such as Sarbanes-Oxley regulations and having a security such as these partnerships or some reporting requirements. It eliminated a lot of those. But your allegation is only that they sort of negligently dealt with RFH, not that they fraudulently dealt with RFH in order to keep the containers close at hand. Correct. Absolutely correct. And we think the complaint thoroughly establishes that Textaner was negligent in doing that, and by saying, for instance, in the cover letter to the proxy statement, that this is fair and in the best interest of the limited partners. These were depreciating assets. At some point the containers would be worthless and then the partnership wouldn't be worth anything, right? You would have an asset that wasn't worth anything. There would be a salvage value, but the ---- And everybody understood that you were going to sell these at about 9 years out, right? No. I don't believe that's correct. Containers have, for tax and accounting purposes, Textaner depreciates them on a 12-year basis. But as is alleged in the complaint, the containers often live or exist out in the world for 15 years. You can stretch another year. But in creating the partnerships, the information was given that the intent is to sell these containers. At some point, yes. And that was like 9, 10 years? No. It would be ---- I believe the representations made were that it would be 12 years, but it was not said that they absolutely would be sold at that point, but that was the expected lifespan. But what would happen, though, is that even a container that has a year left on it has a value. For instance, 2004, steel prices were going through the roof, and the steel itself was worth a lot of money. And so the salvage value of containers ---- Are you talking about book value or are you talking about appraised value? I'm sorry, the second? Are you talking book value or appraised value? Well, the appraised value would be based, is what this case is based on, on a discounted cash flow basis. The book value would be more in conformance with the depreciation and however they're doing that internally. But in valuing containers for sale, you would use a discounted cash flow. And so when lease rates went up ---- And then is the appraisement completely independent? No. And that is a major issue in this case. There was no independent appraisal. There was no investment banker retained to appraise. And that's, as we've alleged in the complaint, a typical thing that's done. An investment banker would be retained. And then shop around, find out who in the container industry, other leasing companies, which Textaner completely excluded, or other types of buyers to get the highest possible price. Textaner just decided that this was what it felt was a fair value. But there were no consultants, such as Manalytics, who plaintiffs have retained, consulted in connection with that. So there were a lot of questions. And all we're saying, all we're saying in the complaint is that, you know, this information needed to be given to the investors. Counsel, tell me about the management agreement. Why is that important to the plaintiff's case? The management agreement? The management agreement is extremely important. And that was a requirement that the purchaser of the containers also retain Textaner. Now, this would have been an entity other than the Textaner partnerships that would have offered the management agreement. So it looked like they were tying something that wouldn't benefit the partnerships. Correct. Exactly. And we've alleged in the complaint that there's value to those management rights. And what really the big point on that is that it excluded all the strategic investors. I'd like to point your attention to in the record, page 845, where we discuss the difference between strategic and financial investors. Other container lessor companies would have loved to have access to these containers because there's high utilization rates in the market. You know, there were very few containers available. They would have put a premium on it, but they don't want to hire their competitor, Textaner, to manage them. So that would factor in. Even for financial buyers, the fact that their hands were tied to Textaner really placed a significant limitation on the value of the containers and what entities would have been. Manalytics supports that. I do want to point out you have a minute and a half left. You may wish to reserve that. I would like to reserve the remainder of my time. Good morning. May it please the Court. My name is Daryl Raines. I'm from Morrison & Forrester. I represent the Textaner defendants who are the appellees in this matter. I'd like to begin by addressing the question that Judge Beeser asked at the beginning of Appellant's argument. He asked a question about the amortization of used containers, and Ms. Giblin responded by talking about how containers should be valued using a discounted cash flow analysis. That issue goes to the heart of why the district court dismissed this case. What the district court found in the complaint were allegations that new containers went through a short-term price spike during the period between when the deal was struck and the proxy solicitation was sent out. What the court asked for on repeated occasions were specific facts pleaded with particularity, showing that a short-term price spike for new containers would have some effect on the value of these used leased containers. Ninety-five percent of the containers that were sold in this transaction were out on lease in the world. They were on boats and in depots and in warehouses. About half of them were subject to five-year-long fixed-rate long-term leases. The remainder of them were leased under master leases, which also have fixed rates, fixed daily rates over a long period of time. And so what the court was asking was if these should be valued on a discounted cash flow basis, what is the evidence that a short-term price change for new, unleased containers could possibly affect the discounted cash flow of containers that have a fixed income stream over a long period of time? What the plaintiffs responded with eventually were expert opinions, but the expert opinion pleaded in the complaint never really speaks to the question that the court asked. So the expert talked about how the new container prices changed. The expert talked about how used prices for unleased containers would change. But the expert never spoke to what would happen to leased containers. And the court asked the question in a number of different ways. The court said, well, can you show me or plead for me facts showing that used leased containers changed in price? Can you show facts that fleets of leased containers were sold at different higher prices? Can you show me some allegation that would say the price, the leased value of these containers could be modified while they're out on lease? And in each case, the plaintiffs were unable to respond to those requests from the court. And so what we're left with is a situation where the court never could see specific facts indicating that these containers, the containers that were sold, actually changed in value as a result of a short-term spot market price change for new containers. Now, if I might, I'd like to address Judge Bybee's question. Judge Bybee, you asked a question about the management rights. Your first question was one of motive, and the simple answer to the motive question, I think, is this. All of the motive arguments, for example, the military contract, et cetera, go to a motive as to whether it was in textainer's interest to sell these containers at all. And if plaintiff's allegations are to be accepted, the simple solution for a textainer would be not to sell the containers. Their arguments do not go to the issue before the court, which is why sell the containers and then sell them at too low a price. What the district court found on the management right issue was that there were not sufficient facts suggesting that the management condition, in other words, the condition that textainer retained management of these containers after their sale, impacted the sales price. Well, I'm, maybe we've got insufficient facts. I do find it curious that you've got these, that we have a whole variety of these corporations that are called textainer, that are different aspects of some master company, some platonic textainer out there. And we have this whole series of partnerships that are being sold. And when we sell the partnerships, you have to take something that might be a poison pill to some bidders. Some bidders might be willing to say, yeah, we want the containers. We don't want the management company. And the management contract didn't benefit any of the owners of the partnerships. There are a couple of them. I know it was disclosed. So I know that that fact was disclosed to the owners of the partnership, and so they would know that this might not be as good a deal as they could get. But I'm curious as to whether you can offer an explanation as to why we had to tie these two things together. Sure. There are several answers to the question. First, we need to be clear that in any limited partnership structure, the general partner is the manager. And so whatever value obtained for the management rights, that was a value that belonged to the general partner, not to the limited partners. There is no value to the limited partners of the management rights per se. Secondly, the logic behind it is actually simple and compelling. Again, imagine that 80,000 containers are out on lease to 300 customers. They're around the world. They're on boats. They're in depots. And they're part of a larger fleet of containers managed by Textaner. And so Textaner looked at that situation and concluded reasonably that the task of trying to cull out those containers, call them back in, repaint them, remark them, and give them to different management would be prohibitively expensive and impractical. So what you really were selling here was the rights to containers that some of which were on long-term leases? Is that right? Almost half of them, Your Honor. Were already on long-term leases. Correct. And so we tied the management rights in order so we didn't have to bring all of them back in. These containers were not on a lot someplace where the new owners could come out and inspect the containers and kick the wheels. That's precisely right. You know, Textaner, often to explain its business, would analogize it to rental cars. And you can do that here. So imagine Hertz has a million cars in lots all around the world, many of which are actually being driven at the moment by someone who leased the car. And if Hertz were to decide we want to sell 10 percent of those, there would be a significant challenge and expense involved in finding all those cars and all the places where they're located around the world, taking them out of lots, taking them back from someone who's driving it, changing the markings, driving it over to Avis or whoever the new purchaser is. And similarly, the conclusion here was that Textaner simply could not cull these containers out in a reasonable way. The average price of these containers when they were sold was about $800. So the cost of finding them in a depot in Singapore or Hong Kong or Shanghai and culling them out of a depot, remarking them, repainting them and driving them over to some other manager. These are like recalling railroad cars, freight cars. You see them on the road all the time, on the freeway. There are these 20-foot or 40-foot shipping containers that can be taken off boats and put on a semi-truck trailer. I saw a ship with them leaving San Francisco Harbor yesterday morning eating breakfast. So Textaner's containers are the ones painted rust orange, and they say Tex on them. And they're all leased out to people. Is there any relationship between the long-term lease and the management contract that was in force at the time of the sale? In other words, if I had a long-term lease for a bunch of containers, would, to use them as I saw fit, would that, would the management contract come with the containers? There are separate contracts. Perhaps I can answer it this way, Your Honor. The way to think about this is the limited partners obviously have no management skills of their own. They're buying a financial investment. Textaner offers the management services. The limited partner investors invest in a revenue stream, which they hope will be large due to Textaner's expertise. When these containers are sold to a new buyer, they, too, are essentially buying a revenue stream from the results of Textaner's management efforts. People who lease containers lease them really irrespective of who the owner is. What they want to know is they deal with a lessor agent, Textaner, who has facilities and capabilities and the ability to deliver all around the world. And so a lessee says, Textaner, I want 1,000 containers. Can I get them in Singapore tomorrow? And they say that irrespective of whether it's a Partnership 1 or a Partnership 6 or some other owner of that container. When the plaintiffs complain about this, who got excluded then from bidding, that is the people who are not interested in bidding here, were people who actually wanted the containers themselves. If I'm thinking of starting a shipping company and operating out of Seattle and I need a whole bunch of containers to get the operation up and going, I'm not going to come to Textaner and buy your containers because they're not on the lot. Correct. The only people that were going to be interested in bidding on these partnerships were people who understood that all they were really buying was not an interest in the container that they could physically possess if they wished to, but really the income stream that would come from the way that Textaner was managing those containers, which at this point were all over the world. That's our point of view, and in fact that's what Discovery has shown. It's not in the record, but, you know, the strong conclusion of Textaner was that transferring management rights would be impossible. Anyone who would want to manage them would know that. There was no point soliciting bids from people who would only want them if they could manage them. Let me use the remainder of my time to talk briefly about the pleading standard, which is an interesting issue and has not been squarely addressed by the Ninth Circuit. The district court decided to apply the Reform Act heightened pleading standard in this case to a Section 14a claim, and if it weren't for the title of that section of the Reform Act, there really wouldn't be any issue here. The text of Section 21dB, which is the heightened pleading standard provision of the 34 Act, says that it applies to every private action arising under the 34 Act, which alleges an untrue statement of material fact or omits to disclose a material fact. That clearly applies to all Section 14 claims, and that is what a number of courts have concluded. There are district courts in this circuit, such as the McKesson case and the Harmona case, as well as circuit court decisions from other circuits, such as the Third Circuit in the NAHC case, and most recently we submitted on our supplemental 28, Rule 28 submission, the Little Jem case decided recently in the Eighth Circuit. But the title of Section 21dB says that it sets out the requirements of, quote, securities fraud actions. And what the plaintiffs argue is that the word fraud in the title somehow limits the application of the text of the statute, which follows. We showed in our papers that under controlling United States Supreme Court authority, the title of a statute is actually not part of the statute. It's merely a shorthand reference for what follows. And in our view, that answers the case here. When Congress used the word fraud in the title, they were doing nothing more than summarizing the phrase material misstatement of fact or omission to disclose a material fact, and nothing more should be read into that word. We have some comfort in that conclusion because the Section 21dB actually imposes two heightened pleading standards. The first one is about falsity. The second one is about the required state of mind. And it's quite interesting, Congress there uses the phrase required state of mind. If this section applied only to fraud claims, Congress could easily have said, pleads facts supporting a strong inference of scienter, or plead facts supporting a strong inference of fraudulent intent. Instead, what Congress said was, in any action where a required state of mind is an element of the claim, plead facts supporting a strong inference of the required state of mind. And that suggests Congress's intent to have the heightened pleading standard apply to sections or to claims where scienter is not the required state of mind. The district court applied this standard, concluded that the complaint fails to plead facts with particularity supporting a finding of falsity in the proxy, and we submit that the district court's decision was correct, and we ask that you affirm it. Thank you. Roberts. Thank you, counsel. Ms. Goodman, you have some time remaining. As for the pleading standard, hopefully I can make this easy. We believe this complaint satisfies any pleading standard, that it's solid, it's detailed, it stands on its own. Do you have to satisfy B-2? Our position is no, we do not. Do you have to satisfy B-1? No. Under falsehooding? That the, well, that there has to be a false or misleading statement under 14A, but the PSLRA does not apply to this case is our position. But even if it were, this complaint easily survives that standard. Now, for the discussion about tracking containers and how difficult it would be to recall them and if they're on lease, each of these containers has a number on it. If you look, next time you're behind one on the freeway or you're driving by a harbor, they have numbers. That's how they know whose goods are on each container and how, when they get to the destination, what is in that container, who it belongs to. So there's really, it's highly tracked and it's easily trackable in that way. And finally, I just want to bring back to the main point is that the real issue here is not so much who's right or wrong, but should the investors have been given this information? Should it have been included in the proxy statement? And even if there is a disagreement, they should have been given that information so they could make an informed decision, and that's what Section 14A stands for. Thank you. Thank you very much. We appreciate the argument of counsel. The Craig case is submitted. Our final case on the oral argument docket today is Shurkin v. Golden State Vendor.
judges: Beezer, Bybee, Roth